IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| TYSON CARTER, | § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 9:21-CV-00289 |
| EAGLE RAILCAR SERVICES LONGVIEW, TEXAS, LLC., | § § § | JUDGE MICHAEL J. TRUNCALE |
| *Defendant*. | § § | |

## **ORDER AND OPINION DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendant Eagle Railcar Services Longview, Texas, LLC.'s Motion for Summary Judgment [Dkt. 25]. For the reasons discussed below, Defendant's Motion is hereby **DENIED**.

### I. BACKGROUND

Plaintiff Tyson Carter was a mechanic at Defendant Eagle Railcar Services Longview, Texas LLC ("Eagle")'s Longview, Texas facility. On four different occasions between September and November of 2020, Mr. Carter allegedly suffered allergic reactions while servicing Pressure Differential hopper railcars ("P.D. hoppers"), or while being in the vicinity when his co-workers serviced the P.D. hoppers. On all four occasions Mr. Carter claims that the reactions caused him to go to the emergency room. Servicing the P.D. hoppers involves "blowing out" the pipes, which causes a white substance—that Eagle identifies as sugar—in the P.D. hoppers to permeate the surrounding area. This is the process that allegedly provokes Mr. Carter's allergic reactions, which include red whelps on his upper body and face, and restricted swallowing and breathing.

On the day after his first reaction, Mr. Carter allegedly notified his lead supervisor of the reaction, that he thought it was triggered by the substance in the P.D. hoppers, and that he ended up in the emergency room. Eagle denies receiving this notice. [Dkt. 18 at ¶ 7]. A couple weeks later, Mr. Carter allegedly was assigned to work on another P.D. hopper, but by the end of the day he began to "welp up again and felt like something was in his throat." He allegedly showed his supervisor, John Northcutt, the reaction and returned

to the emergency room that night because "his breathing had become difficult" and he had "big red whelps all over his upper body and face."

Upon returning to work, Mr. Carter reported to his superiors that he suffered an allergic reaction from working on the P.D. hoppers, and asked to not be assigned to work on the particular P.D. hoppers. Eagle honored this request, but nonetheless, Mr. Carter suffered another allergic reaction shortly thereafter when working in proximity to the servicing of a P.D. hopper by his co-workers. Mr. Carter claims that he subsequently reported this third reaction and emergency room visit to his superiors, who denied his request to, if possible "move him to another department if this was something they were going to continue doing."

A couple of weeks later, Mr. Carter allegedly suffered a fourth allergic reaction. The next day, at a doctor's office visit related to the reactions, he discovered that he had a fever. Because Eagle's protocol required employees with fevers to stay home from work until receiving negative COVID-19 test results, Mr. Carter missed three or four days of work. Upon returning to work, Mr. Carter claims that he asked whether he would be paid for his days off, and whether these allergic reactions may be covered by workers' compensation—both which were answered in the negative. Eagle claims that Mr. Carter did in fact file a workers' compensation claim with the Texas Department of Insurance, "which was denied following an investigation due to 'no medical of an injury' occurring in the course and scope of Plaintiff's employment with Eagle." [Dkt. 18 at ¶ 15].

At a morning meeting on November 25, 2020—the day before Thanksgiving—Mr. Carter learned that a P.D. hopper would be serviced that afternoon next to the railcar he would be working on. Eagle and Mr. Carter tell very different stories about what happened next. According to Mr. Carter, he requested to leave work early, after lunch, to avoid being in the environment that caused his allergic reactions. His supervisor, Greg Miner, subsequently informed the department that they would be working eight hours that day instead of ten, so Mr. Carter requested to leave at 10:00 A.M. instead of after lunch. Mr. Miner told him that they would "talk about it when that time comes" but approximately ten minutes later approached Mr. Carter's work area, gave him a "cutthroat sign" and terminated him, providing no reason other than that his services were no longer needed. Conversely, Eagle contends that during the morning meeting, Mr.

Carter "announced that he was going to leave his shift early at lunch" and that when "Mr. Miner replied that [Mr. Carter] needed to stay until 2:30 P.M. as scheduled, [Mr. Carter] announced in front of the gathered group that he would leave at 10:00 A.M. and that Mr. Miner couldn't tell him what to do." [Dkts. 18 at ¶ 17]. Supposedly, Mr. Carter then "grew belligerent and refused to finish his scheduled shift," and made statements such as "why don't you just fire me?," that he "was waiting for this," and that his supervisor "was going to regret it." [Dkt. 25 at ¶ 3]. Eagle maintains that Mr. Carter was terminated for this insubordination and refusal to work.

Mr. Carter subsequently brought this case. He alleges that Eagle violated the Americans with Disability Act ("ADA") by: (1) terminating him because of his actual or perceived disability, and (2) failing to accommodate his requests not to work in the environment which caused his allergic reactions or to engage in the interactive process to determine if his allergies could be accommodated. [Dkt. 13 at 5]. Mr. Carter also alleges that Eagle discharged and retaliated against him in violation of Section 451.001 of the Texas Labor Code because he reported an on-the-job injury. *Id.* at 6. Eagle denies these claims and now seeks summary judgment [Dkt. 25].

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted); Fed. R. Civ. P. 56(c). An issue is material if its resolution could affect the outcome of the action. *DIRECTV*, 420 F.3d at 536. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All reasonable inferences must be drawn in favor of the nonmoving party. *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002). There is no genuine issue of material fact if, when the evidence is viewed in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (citations omitted).

Where the dispositive issue is one which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating there is no evidence in the record to establish an essential element of the nonmovant's claim. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (internal citations omitted).

If, under the first option, the nonmoving party cannot point to evidence sufficient to dispute the movant's contention that there are no disputed facts, the moving party is entitled to summary judgment as a matter of law. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Under the second option, the nonmoving party may defeat the motion by pointing to "supporting evidence already in the record that was overlooked or ignored by the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332–33 (1986) (Brennan, J., dissenting).

If the nonmoving party can meet its burden under either of these scenarios, the burden shifts back to the movant to demonstrate the nonmovant's inadequacies. *Id.* If the movant meets this burden, "the burden of production shifts [back] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Celotex*, 477 U.S. at 333 n.3. "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial." *Parekh v. Argonautica Shipping Invests. B.V.*, No. CV 16-13731, 2018 WL 295498, at *3 (E.D. La. Jan. 4, 2018) (quoting *Celotex*, 477 U.S. at 333 n.3).

### III.   DISCUSSION

**A.   ADA Claims**

The ADA prohibits covered employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). With respect to an individual, the term "disability" means: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B) a record of such an impairment; or (C) being regarded as having such an impairment." *Id*. § 12102(1)(A)–(C). "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*. § 12102(2)(A). It also includes "the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." *Id*. § 12102(2)(B). "An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability." *Id*. § 12102(4)(C). And "[a]n impairment that is episodic . . . is a disability if it would substantially limit a major life activity when active." *Id.* § 12102(4)(C).

An individual is "regarded as having such an impairment" under the ADA "if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." *Id.* § 12102(3)(A).

Congress amended the ADA in 2008 to "make it easier for people with disabilities to obtain protection under the ADA." *Cannon v. Jacobs Field Servs. N. Am.*, 813 F.3d 586, 590 (5th Cir. 2016) (quoting 29 C.F.R. § 1630.1(c)(4)). "A principal way in which Congress accomplished that goal was to broaden the definition of 'disability.'" *Id*; *see* 42 U.S.C.§ 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."). First, the amendments clarified "that the Supreme Court and EEOC had interpreted the 'substantially limits' standard to be a more demanding one than Congress had intended." *Cannon*, 813 F.3d at 590 (citing 42 U.S.C. § 12101 note "expressly disapproving of prior Supreme Court decisions and EEOC interpretations of the 'substantially limits' standard"). *See Neely v. PSEG Tex. Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013) ("In crafting the [Amended ADA] Congress intended . . . that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis."). And second, the Amended ADA makes it easier for people to obtain

protection by now covering "not just someone who is disabled but also those subjected to discrimination because they are regarded as having an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*." *Cannon*, 813 F.3d at 591 (cleaned up). Case law on what constitutes a "disability" under the ADA before the 2008 amendments is therefore no longer instructive.[1]

### 1. Whether Mr. Carter is a qualified person with a disability is fact issue for the jury to decide.

Eagle's first argument for summary judgment is that Mr. Carter "is not a 'qualified person with a disability' as outlined under the ADA." [Dkt. 25 at 9]. Specifically, that although Mr. Carter "alleges that on four occasions between September and November of 2020 he experienced allergy-type reactions, merely having an impairment does not make one disabled for purposes of the ADA" and that he is "also required to demonstrate that the impairment 'substantially limited a major life activity.'" *Id.* Eagle relies on Pre-Amendments case law to support its claim that "[t]emporary, occasional, and sporadic allergy symptoms are the opposite of the permanent issues that are the 'touchstone of a substantially limiting impairment.'" *Id.* (quoting *Butler v. Exxon Mobil Corp.*, 838 F. Supp. 2d 473, 487 (M.D. La. 2012) (considering ADA claims based on alleged conduct occurring before 2008)). This interpretation of the ADA's requirements is directly at odds with the ADA's express inclusion of episodic impairments as disabilities if the episodic impairment "substantially limit[s] a major life activity when active." *See* 42 U.S.C. § 12102(4)(D). And Eagle's assertion that Mr. Carter "has failed to explain what major life activity is impaired by his alleged disability," [Dkt. 25 at 10], ignores Mr. Carter's allegations that the allergic reaction caused his swallowing

---

[1] The 2008 amendments do not apply retroactively, therefore, many cases published after 2008 still apply the Pre-Amendments standards if the alleged conduct occurred before the amendments' enactment. *See, e.g.*, *Griffin v. United Parcel Serv., Inc.*, 661 F.3d 216, 222 (5th Cir. 2011). These cases likewise are not instructive to the Court's present inquiry.

and breathing to become restricted. *See* [Dkt. 13 at 2]. Swallowing and breathing are undoubtedly major life activities. *See* 42 U.S.C. § 12102(2)(A)–(B).[2]

Eagle also disputes that Mr. Carter is a qualified person with a disability because "he never had the complained-of physical reaction prior to his employment with Eagle and has not experienced the complained-of physical reaction since his termination with Eagle." [Dkt. 25 at 9]. But this does not mean that Mr. Carter, as a matter of law, was not a qualified person with a disability when the alleged violations occurred. That is a question for the jury to resolve.

Even if Mr. Carter's allergic reactions are not an impairment that limits a major life activity, he nonetheless is a qualified individual with a disability under the ADA if he establishes that he "has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment." 42 U.S.C. § 12102(3)(A). This is true "whether or not the impairment limits or is perceived to limit a major life activity." *Id.* Indeed, Mr. Carter claims that Eagle terminated him because of his "actual *or perceived* disability." [Dkt. 13 at 5]. Seeking summary judgment on this allegation, Eagle pleads:

> Defendant's understanding of Plaintiff's alleged disability was insufficient to rise to the level of Plaintiff's being regarded as having a qualifying disability because Plaintiff's alleged disability would still have to be something that would have risen to the level of substantially limiting a major life activity. . . . [T]he threat of sporadic whelps triggered under a specific set of circumstances by a common household food product as a single facet of Plaintiff's employment does not threaten Plaintiff's ability to perform any major life activity.

[Dkt. 25 at 14]. Eagle's argument fails for two reasons. First, it again relies on outdated case law and contradicts the express language of the ADA, which provides that a person may be regarded as having a disability if they are perceived as having an impairment, "whether or not the impairment limits or is perceived to limit a major life activity." *See* 42 U.S.C. § 12102(3)(A). And second, Eagle's argument once

---

[2] Eagle also supports its claim by citing a 2005 opinion from the Southern District of Texas finding that a plaintiff's generalized incidents of chest congestion and breathing difficulty were insufficient to demonstrate a disability because the plaintiff failed to present any evidence of the extent of such limitations. [Dkt. 25 at 11]. As previously discussed, however, opinions determining what constitutes a disability under the ADA before it was amended are no longer instructive.

7

again ignores Mr. Carter's allegations that the allergic reactions restricted his ability to breathe, *see, e.g.*, [Dkt. 13 at 2], which is a major life activity. *See* 42 U.S.C. § 12102(2)(A).

### 2. There are genuine issues of material fact as to whether Eagle accommodated Mr. Carter's reasonable requests.

Eagle's next argues that summary judgment on Mr. Carter's failure to accommodate claim is proper because it fully accommodated Mr. Carter's reasonable requests. Specifically, Eagle contends that upon Mr. Carter's request, Eagle immediately agreed to not assign Mr. Carter to work on or near any P.D. hopper. [Dkt. 25 at 11]. According to Eagle, Mr. Carter's supervisors also ordered that the substance residue be removed from the P.D. hoppers outside the mechanical shop rather than within to further protect Mr. Carter from accidental exposure. *Id.* Mr. Carter tells a different story. For example, he alleges that on the day he was fired, he was scheduled to work next to a P.D. hopper that was being serviced. [Dkt. 13 at 4]. Therefore, genuine issues of material fact exist as to whether Eagle accommodated Mr. Carter's requests.

Eagle also admits that it did not accommodate Mr. Carter's request to be assigned to a different facility. It is Eagle's position that denying this request did not violate the ADA "because reassigning [Mr. Carter] to a different facility would necessitate relieving [Mr. Carter] of an essential function of his job or modify his duties and would require other Eagle employees to be reassigned to complete the work [Mr. Carter] was no longer able to do." *Id.* at 12. But whether assigning Mr. Carter to a different facility constitutes a reasonable accommodation that would have permitted Mr. Carter to perform the essential function of his job is a question for the jury, not Eagle, to decide.

### 3. There are genuine issues of material fact as to whether Mr. Carter's termination was based on an impairment.

Eagle next claims that there is no direct evidence that its termination of Mr. Carter was based in any manner on any impairment or medical condition. [Dkt. 25 at 12]. When analyzing a discriminatory-termination claim under the ADA where there is no direct evidence of discrimination, courts apply the *McDonnell Douglas* burden-shifting analysis. *Nall v. BNSF Ry. Co.*, 917 F.3d 335, 340 (5th Cir. 2019) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). The *McDonnell Douglas* framework first requires the employee to establish a prima facie case of discrimination. *E.E.O.C. v. LHC Grp. Inc.*,

8

773 F.3d 688, 694 (5th Cir. 2014). Specifically, the employee must establish that: (1) he is disabled within the meaning of the ADA, (2) he was qualified for the job, and (3) he was fired on account of his disability. *Gosby v. Apache Indus. Servs. Inc.*, 30 F.4th 523, 526 (5th Cir. 2022). This burden is not onerous, however. *Turner v. Kansas City Ry. Co.*, 675 F.3d 887, 892 (5th Cir. 2012) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). If the employee establishes its prima facie case of discrimination, the burden shifts to the defendant employer to articulate a "legitimate, non-discriminatory reason for the firing." *Gosby*, 30 F.4th at 526 (internal quotation marks omitted). "If the employer does so, the burden returns to the plaintiff to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Id.*

Eagle only takes issue with the third element of Mr. Carter's prima facie case. Eagle claims that Mr. Carter's "belligerent and insubordinate behavior and refusal to work had nothing to his with his medical condition" on November 25th, and that "it wasn't until [Mr. Carter's] final outburst, including inflammatory language and insubordination when he demanded publicly to be released from his assignment" that he was terminated. [Dkt. 25 at 13]. But as previously discussed, Mr. Carter tells a different story of what happened that day. *See supra* at 2; [Dkt. 13 at 4–5]. *Id.* Given the discrepancies between Eagle's and Mr. Carter's stories, a genuine issue of material fact clearly exists as to whether Mr. Carter has established a prima facie case for discriminatory termination under the ADA. Summary judgment therefore is improper.

Eagle also contends that even if Mr. Carter established a prima facie case, that Eagle has articulated a legitimate non-discriminatory reason for terminating Mr. Carter—his refusal to perform his assigned tasks and public insubordinate behavior—so the burden shifts back to Mr. Carter to produce evidence from which a jury could conclude that Eagle's proffered reasons were not true, but instead were a pretext for unlawful discrimination. [Dkt. 25 at 13–14]. Eagle denies that Mr. Carter has met this burden, but this is also a question for the jury to decide, as genuine issues of material fact exist. Mr. Carter denies making the insubordinate statements attributed to him by Eagle, and insists that he never refused to work. He claims that he simply requested an accommodation and was terminated before even being given the opportunity to work his shift.

## B. Texas Labor Code Claim

Section 451.001 of the Texas Labor Code, titled "Discrimination Against Employees Prohibited" provides:

> A person may not discharge or in any other manner discriminate against an employee because the employee has:
> 
> (1) filed a workers' compensation claim in good faith;
> 
> (2) hired a lawyer to represent the employee in a claim;
> 
> (3) instituted or caused to be instituted in good faith a proceeding under Subtitle A; or
> 
> (4) testified or is about to testify in a proceeding under Subtitle A.

"A proceeding under Subtitle A" refers to a proceeding under the Texas Workers' Compensation Act (the "Act"). *See* Tex. Lab. Code Ann. § 401.001 *et seq*.

In his third cause of action against Eagle, Mr. Carter alleges that Eagle discharged him and retaliated against him in violation of Section 451.001 of the Texas Labor Code because he reported an on-the-job injury. [Dkt. 13 at 6]. Eagle contends that summary judgment is proper on this claim because Mr. Carter did not file a worker's compensation claim or any other Workers' Compensation Act proceeding until after he was terminated. [Dkt. 25 at 15].

"Proceeding" is not defined by the Act. *See id.* § 401.011. But several Texas courts of appeals have held that Section 451.001(3) "does not require an employee to actually file a workers' compensation claim, and that an employee institutes or causes to be instituted a proceeding under the Texas Workers' Compensation Act when he informs his employer of his on-the-job injury." *Salas v. Fluor Daniel Servs. Corp.*, 616 S.W.3d 137, 148 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (collecting cases). In *Texas Steel Co. v. Douglas*, the Fort Worth Court of Appeals concluded that the "instituted or caused to be instituted" language must be construed to include part of the proceeding prior to an employee filing his claim for compensation to avoid being superfluous, given that the statute already provides a cause of action

for employees who are fired because they filed a claim. 533 S.W.2d 111, 116 (Tex. App.—Fort Worth 1976, writ ref'd n.r.e.).[3]

There is no dispute that Mr. Carter informed his employer, Eagle, that he suffered an on-the-job injury. *See* [Dkt. 18 at 3] ("Defendant admits that Plaintiff reported to Mr. Northcutt having an allergic reaction to the P.D. hopper cars . . . ."). Therefore, Mr. Carter instituted or caused to be instituted a proceeding under the Act when he informed Eagle of his alleged on-the-job injury. *See Salas*, 616 S.W.3d at 148. Eagle's argument on this point is without merit.

Finally, Eagle contends that even if Mr. Carter had instituted a proceeding under the Act, that he has failed to demonstrate any causal nexus between his termination and his alleged workplace injury. [Dkt. 25 at 16].

When pursuing a claim under Section 451.001, the plaintiff bears the burden of "establishing a causal nexus" between his protected conduct under the Act and his termination. *See Piper v. Kimberly-Clark*, 970 F. Supp. 566, 574 (E.D. Tex. 1997), *aff'd* 157 F.3d 903 (5th Cir. 1998) (citing *Parham v. Carrier Corp.*, 9 F.3d 383, 386 (5th Cir. 1993)). "The plaintiff need not prove that his quest for workers' compensation was the sole reason for his discharge, but he must establish that it was a determining factor." *Parham*, 9 F.3d at 386.

Mr. Carter responds to Eagle's claim that he has failed to demonstrate a causal nexus between his termination and his alleged workplace injury by asserting four pages worth of circumstantial evidence. *See* [Dkt. 33 at 16–20]. His evidence includes knowledge of his allergic reactions by Eagle's decision maker, his superior's alleged skepticism toward his allergic reactions, and the temporal proximity between his reporting the reactions and his termination. *Id.* The Court is satisfied that there is a genuine issue of material fact as to whether Mr. Carter has established a causal nexus between his protected conduct and being terminated. Eagle's final argument for summary judgment therefore fails.

---

[3] *Texas Steel Co.* interpreted a former version of the Texas Workers' Compensation Act, but its analysis is consistent with the current version.

11

## IV. CONCLUSION

It is therefore **ORDERED** that Defendant Eagle Railcar Services Longview, Texas, LLC.'s Motion for Summary Judgment [Dkt. 25] is **DENIED**.

**SIGNED this 7th day of December, 2022.**

*Michael J. Truncale*
Michael J. Truncale
United States District Judge